UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DEVON LETOURNEAU, | ) |
| Plaintiff, | ) |
| v. | ) C. A. No. 12-848-M |
| A.T. Wall, et al. | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

JOHN J. MCCONNELL, JR., United States District Judge.

Plaintiff Devon Letourneau has filed a civil rights Complaint[1] (ECF No. 1) pursuant to 42 U.S.C. § 1983.[2] The Court is required to screen the Complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A. Mr. Letourneau, an inmate at the R.I. Adult Corrections Institution ("ACI") challenges his classification and housing assignment. Because he has not shown a violation by state officials of any protected liberty interest, this Court finds that Mr. Letourneau has failed to state a claim on which relief may be granted.

---

[1] Mr. Letourneau filed an Amended Complaint (ECF No. 6), adding an additional defendant, Special Investigator Figurrito, and an additional claim. For convenience, the Court treats the Amended Complaint and original Complaint collectively ("Complaint") except when citing to a specific paragraph or page.
[2] He has also filed an Application to Proceed without Prepayment of Fees and Affidavit (ECF No. 2) and an *In Forma Pauperis* Affidavit (ECF No. 3) in support thereof.

I. Facts and Background

Mr. Letourneau alleges that a number of officials of the Rhode Island Department of Corrections ("RIDOC")[3] violated his rights under the First, Eighth, and Fourteenth Amendments by placing him in a classification that was too restrictive. He seeks declaratory and injunctive relief, compensatory and punitive damages, and costs.

In brief, Mr. Letourneau alleges that ACI officials transferred him from protective custody in "C-Domicile" to a hospital wing cell, and then ultimately to "A-Domicile" (a 23-hour lockdown and segregation domicile), despite the fact that he has never been a disciplinary problem or a health risk. While in the hospital wing, he alleges that he asked for grievance forms but was told that his situation was "non-grievable."[4]

In addition, ACI officials downgraded Mr. Letourneau's status from "A" status to "C" status. This resulted in a loss of many privileges, including, among others, his full law library privileges (limiting his ability to pursue his state court matters) and his opportunity to socialize with other inmates. Mr. Letourneau went before the Classification Board (the "Board") and they informed him that officials had reclassified him because they had to protect two juveniles, who officials had to place in "C-Domicile" after they were waived out of Family Court and therefore housed at the ACI.

The two juveniles were accused of murdering a young woman rumored to be Mr. Letourneau's half-sister. Mr. Letourneau told the Board that he had informed Special

---

[3] Director A.T. Wall; Assistant Director David McCauley; High Security Center ("HSC") Warden James Weeden; HSC Deputy Warden Alfred Leach; Director of Classification Joseph DiNitto; and HSC Counselor Anthony Amaral (collectively "Defendants").

[4] Despite this statement, Mr. Letourneau has included as an exhibit to the Complaint a Notice of Transfer to Administrative Confinement that states: "You have the right to protest your transfer, in writing, to the Warden via the formal Inmate Grievance Procedure." (ECF No. 1 at Ex. E.) The stated reason for the transfer was safety and security. (*Id.*) Mr. Letourneau refused to sign this form. (*Id.*; *see also* ECF No. 1 at ¶ 12.)

2

Investigator Figurrito that he did not know his father or the young woman well, that he had perhaps met her twice, that he did not know her family, and that he was not emotionally attached to her. He stated that he posed no threat to the juveniles and, in fact, knew one of them. He further stated that he did not want to do anything to jeopardize his housing in protective custody in "C-Domicile" and therefore his full library privileges in order to pursue his state court legal matters or Mr. Letourneau further argued that his reclassification violated his rights to equal protection and to be free from cruel and unusual punishment.

Despite his protestations, the Board downgraded Mr. Letourneau's classification to "C" status. The Board advised Mr. Letourneau that if he wanted to challenge the decision he should write to the Assistant Director and that if the Assistant Director agreed with Mr. Letourneau, the Board would respect the Assistant Director's decision. Mr. Letourneau wrote to both Warden Weeden and Assistant Director McCauley, but his circumstances did not change. Mr. Letourneau alleges that he is suffering from stress because of this reclassification.

II. <u>Law</u>

    A. <u>Screening under §§ 1915(e)(2) and 1915A</u>

In connection with proceedings *in forma pauperis*, § 1915(e)(2) instructs the Court to dismiss a case at any time if the Court determines that the action, *inter alia*, "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2). Similarly, § 1915A directs courts to screen complaints filed by prisoners against "a governmental entity or officer or employee of a governmental entity" and dismiss the complaint, or any portion thereof, for the same reasons as those set forth in § 1915(e)(2). 28 U.S.C. § 1915A.

The legal standard for dismissing a complaint for failure to state a claim pursuant to §§ 1915(e)(2) and 1915A is the same standard used when ruling on a Rule 12(b)(6) motion to

dismiss. *Davis v. Prison Health Servs.*, 679 F.3d 433, 437 (6th Cir. 2012); *Rondeau ex rel Rondeau v. New Hampshire*, 201 F.3d 428, at *1 (1st Cir. 1999) (Table decision). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp.*, 550 U.S. at 555). In making this determination, this Court accepts Mr. Walker's well-pled allegations as true and "scrutinize[s] the complaint in the light most favorable to [him]." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). Although this Court construes pleadings of a *pro se* plaintiff "liberally," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678-79 (citing *Twombly*, 550 U.S. at 555).

B. <u>Legal Standard under § 1983</u>

"Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (quoting *Redondo–Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir. 2005)). "Section 1983 requires three elements for liability: deprivation of a right, a causal connection between the actor and the deprivation, and state action." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing 42 U.S.C. § 1983).

Mr. Letourneau's § 1983 claims are constrained by some additional requirements. For example, Mr. Letourneau cannot assert § 1983 claims for money damages against any of the

defendants in their official capacities. *See Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71 (1989) (holding that "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). Claims against them in their official capacities for injunctive relief, however, may be permissible. *Id.* at 71 n.10 (noting that state officials sued in their official capacities for injunctive relief are persons under § 1983 because such actions are not considered actions against the State); *see also Morgan v. Ellerthorpe*, 785 F.Supp. 295, 299 (D.R.I. 1992).

As Mr. Letourneau has named senior RIDOC employees as defendants, this Court notes that "[§] 1983 does not impose purely supervisory liability; it aims at persons who have actually abused their positions of authority, and hence only persons who were directly involved in the wrongdoing may be held liable." *Martinez–Vélez v. Rey-Hernández*, 506 F.3d 32, 41 (1st Cir. 2007) (internal quotation marks and citations omitted). For example, "a supervisor's behavior may come within this rule [] by formulating a policy, or engaging in a custom, that leads to the challenged occurrence." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). And supervisors also may be held liable for their "own acts or omissions" when those "acts or omissions [] amount to a reckless or callous indifference to the constitutional rights of others." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91-92 (1st Cir. 1994) (internal citations omitted).

III. <u>Discussion</u>

"Rhode Island has not enacted any statute or regulation that gives rise to any statutory inmate liberty interest in its prison-inmate classification system." *Bishop v. State*, 667 A.2d 275, 278 (R.I. 1995).

The Rhode Island Supreme Court explained:

> The classification and housing of prison-inmates in Rhode Island is regulated by §§ 42-56-30, 42-56-31, and 42-56-32. Section 42-56-31, which sets

> out the duties of the prison classification board, requires the board to review the "studies" made of each inmate and to recommend to the director a security classification and rehabilitation program for each inmate. The director [or his designee] is then required to review the board's recommendation and if approved by the director, it is then put into effect. In those instances where the director disapproves the recommendation, the director is then required to send the disapproved recommendation back to the board for its further study, review, and sequential recommendation. If the director once again disapproves the board's recommendation as to the inmate's classification, the statute explicitly states that the director's "decision shall be final."
> It appears clear to us from the language used in the inmate classification statutes under review that the director of the Department of Corrections has unfettered discretion in the inmate-housing classification process.
> A protected state-created liberty interest within the meaning of the due process clause of the Fourteenth Amendment arises only when a state places substantive limits on official discretion, which require that a particular outcome be reached upon a finding that the relevant criteria have been met. ... Rhode Island has not enacted any statute or regulation that gives rise to any statutory inmate liberty interest in its prison-inmate classification system.

*Id.* at 277-78 (internal citations and quotation marks omitted); *DiCiantis v. Wall*, 795 A.2d 1121, 1125 (R.I. 2002)(noting *Bishop*'s holding that "the director of the [RI]DOC has 'unfettered discretion' in making classification decisions").

Under *Bishop*, an inmate has no statutory liberty interest in his housing or classification. 667 A.2d at 277; *see also Carillo v. Moran*, No. C.A. 77-0283L, 1993 WL 389383, at *3 (D.R.I. Aug. 11, 1993) (noting that Rhode Island has not created any liberty interest in inmate classification that had been violated); *DeCiantis v. R.I. Dep't of Corrs.*, 840 A.2d 1090, 1092 (R.I. 2003)(reaffirming decision in *Bishop*). Therefore, Mr. Letourneau's claim that he had a "right" (ECF No. 1 at ¶¶ 12, 14) to remain in "C-Domicile" and at "A" level classification is without merit.

Moreover, the *Bishop* court noted that:

> It is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-disciplinary reasons for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. The phrase "administrative segregation," as used by the state authorities here,

> appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.

*Bishop*, 667 A.2d at 278-79 (internal citation omitted).

It appears that Defendants have treated Mr. Letourneau appropriately under the law, fully protecting his grievance rights. ACI officials gave Mr. Letourneau notice of the reason for his transfer to administrative segregation, i.e., safety and security. (ECF No. 1 at Ex. E.) He was brought before the Board, where he was given the opportunity to contest the transfer and reclassification. (*Id.* at ¶ 14) During the hearing, he was told that he was being moved to protect the two juveniles and he was being reclassified because protective custody was not supposed to be in the HSC. *Id.*; *see also DeCiantis*, 840 A.2d at 1093 (noting that an inmate is entitled to know the reasons on which the decision is based). Finally, he was advised that if he wished to contest the Board's decision, he should write to Deputy Director McCauley, which Mr. Letourneau did, along with Warden Weeden. (ECF No. 1 at ¶¶ 14-15.) Mr. Letourneau received a response from Assistant Director McCauley, informing him that his "situation has been forwarded back to the Special Investigation Unit for re-evaluation of the circumstances." (ECF No. 6 at Ex. H.); *see also* R.I. Gen. Laws § 42-56-31.

Classification is essential to the operation of an orderly and safe prison. *Palmigiano v. Garrahy*, 443 F. Supp. 956, 965 (D.R.I. 1977); *DeCiantis*, 840 A.2d at 1092 ("Inmate classification is a confidential administrative matter squarely within the [RI]DOC director's discretion."); *Bishop*, 667 A.2d at 278 (noting necessity of broad discretionary authority due to extraordinarily difficult undertaking of administration of a prison) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). Federal courts "ought to afford appropriate deference and flexibility to

7

state officials trying to manage a volatile environment." *Sandin v. Connor*, 515 U.S. 472, 482 (1995); *see also Ferranti v. Moran*, 618 F.2d 888, 890 n.1 (1st Cir. 1980) (noting that "federal courts are extremely reluctant to limit the discretion of prison officials to classify prisoners as they deem appropriate.") (internal quotation marks omitted).

This Court finds that Mr. Letourneau has no protected liberty interest in his classification or housing at the ACI. Moreover, according to the allegations in the Complaint, Defendants treated him properly and according to the law. Therefore, he has failed to state a claim on which relief may be granted, and the Complaint[5] must be DISMISSED.

IV. Conclusion

Because the Court finds that Mr. Letourneau has failed to state a claim on which relief may be granted, the Complaint is hereby DISMISSED. Mr. Letourneau's Application to proceed *in forma pauperis* (ECF No. 2) is DENIED as moot.

IT IS SO ORDERED.

/s/ John J. McCauley

John J. McConnell, Jr.
United States District Judge

May 20, 2013

---

[5] It is unclear why Mr. Letourneau added Special Investigator Figurrito or what claim(s) he wishes to pursue against him. He may be the investigator to whom Assistant Director McCauley referred the matter for further consideration. Otherwise, the only new statements Mr. Letourneau makes regarding Special Investigator Figuritto is that he "briefly spoke to the Plaintiff indicating that he was going to allow the Plaintiff to make phone calls and receive [sic] his property," (ECF No. 6 at ¶ 4), but that "Defendant Figuritto has done nothing to remove the Plaintiff from his confinement." (*Id.* at ¶ 7.) Presumably the "additional information and evidence," (*id.* at ¶ 2) to which Mr. Letourneau refers is the letter from Assistant Director McCauley. (*Id.* at Ex. H.)